IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 11, 2002

## STATE OF TENNESSEE v. JAMES RUBEN CONYERS

**Direct Appeal from the Circuit Court for Houston County
No. 4443     Allen W. Wallace, Judge**

---

**No. M2002-01007-CCA-R3-CD - Filed September 5, 2003**

---

The appellant, James Ruben Conyers, was convicted by a jury in the Houston County Circuit Court of especially aggravated burglary, a Class B felony; especially aggravated robbery, a Class A felony; and attempted first degree murder, a Class A felony. Following a sentencing hearing, the trial court sentenced the appellant to an effective sentence of eighty years incarceration in the Tennessee Department of Correction. On appeal, the appellant raises numerous issues relating to the sufficiency of the evidence, the admission of evidence, the sufficiency of the indictment, the jury instructions, and sentencing. Upon review of the record and the parties' briefs, we find no merit to the appellant's contentions. However, we recognize as plain error that the appellant's conviction for especially aggravated burglary was prohibited under Tennessee Code Annotated section 39-14-404(d) (1997). Accordingly, we modify the conviction to aggravated burglary and reduce the appellant's sentence for this conviction to ten years incarceration, for a total effective sentence of eighty years.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed in Part, Modified in Part, and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

William B. "Jake" Lockert, III, and Wade Bobo, Ashland City, Tennessee, for the appellant, James Ruben Conyers.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Carey Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Factual Background

On April 6, 2001, at approximately 7:30 p.m., eighty-six-year-old Mildred Parker had just sat down to watch "Diagnosis Murder" when she heard a knock at the front door. Because it was

unusual for anyone to use her front door, Mrs. Parker did not open the door, but instead looked out the window to see who was knocking. When she looked out the window, a black male, later identified as the appellant, inquired about purchasing her car. Mrs. Parker informed the appellant that the vehicle was not for sale, but the appellant insisted on speaking with her. Mrs. Parker shook her head and told him, "No." She then walked to the back of the house to ensure that the back doors were locked.

When Mrs. Parker reached the back door, she observed the appellant "walking up the ramp . . . [with] a big, fat rock in his hand."[1] The appellant demanded that Mrs. Parker open the door, but she refused. The appellant then became belligerent and yanked on the door, shouting, "You bitch you, I'll kill you and get your money. Open this door." As Mrs. Parker turned to run into the bedroom, the appellant shattered the glass in the back door with his hand. Mrs. Parker proceeded to the bedroom where her deceased husband had hidden a loaded .38 Special revolver. She grabbed the revolver, but her arthritis prevented her from being able to pull the trigger.[2] By this time, the appellant had entered the house and reached the bedroom. Mrs. Parker then ran through the house to the kitchen door and attempted to exit the house. Before she could escape, the appellant "grabbed [her] by the hair and pulled [her] back in."

The appellant's hand was bleeding profusely. Mrs. Parker testified at trial that the appellant "didn't want any of his blood there and he started wiping up all the blood," using towels, cooking gloves, rugs from the kitchen floor, and a red and white checked apron. After attempting to clean up the blood, the appellant demanded money from Mrs. Parker. Mrs. Parker led the appellant into a small office and gave the appellant "a little over $500" that she had received for her birthday. The appellant was not satisfied with this amount and demanded more money, but Mrs. Parker informed him that she had no more. The appellant then stated, "Well just write me a check for $500.00 and I'll go." Mrs. Parker told the appellant that she did not have $500, and instead wrote him a check for $200. Thereafter, the appellant forced Mrs. Parker to write a note on the back of another check, which note read, "I'm suicidal myself."

By this time, Mrs. Parker was covered in blood. She explained at trial that "[i]t was all [the appellant's] blood . . . because I hadn't been hurt [or] cut at the time." The appellant made Mrs. Parker go into the bathroom, undress, and shampoo her hair. He then helped Mrs. Parker rinse the shampoo and blood from her hair. Thereafter, Mrs. Parker dressed in a pair of pajamas and sat on the sofa in the living room. The appellant handed Mrs. Parker her purse. Complying with his instructions, Mrs. Parker took out her billfold and "gave [the appellant] what money was in there."

Thereafter, the appellant approached Mrs. Parker, put a white telephone cord around her neck, and proceeded to choke her. Finding the white cord to be insufficient to choke Mrs. Parker, the appellant wrapped a brown extension cord around her neck. Still unsatisfied with his

---

[1] At trial, Mrs. Parker testified that she never again saw the rock.

[2] Mrs. Parker testified that the gun fell out of her hand and she believed that the appellant picked it up.

-2-

progress, the appellant pulled Mrs. Parker off the sofa and began yanking up and down on the extension cord, banging her head into the floor. Mrs. Parker was able to prevent the appellant from choking her by placing two fingers under the cord. The appellant then hit Mrs. Parker in the head with an unknown object, poured Clorox in her face, and "stomped" her in the head. In order to end the attack, Mrs. Parker "went limp" and pretended to be dead.

The appellant took a cloth and wiped Mrs. Parker's face, body, and shoes. Mrs. Parker heard the appellant walking around her house and then she heard a door close. Fearing the appellant would return, Mrs. Parker lay still and waited. Finally, she felt her Siamese cat nudge her leg and, because her cat would not come out when other persons were in the house, Mrs. Parker knew the appellant was gone.

Following the appellant's departure, Mrs. Parker sat up and observed that her head was bloody and blood was running into her face. She managed to walk to her telephone and dial 911; however, because she could not hear, she was unaware that the operator answered. Mrs. Parker hung up and dialed again. Still unable to hear the operator, Mrs. Parker decided to call her family. She called her cousin, whom she informed, "I have been hurt, been beaten, come to me." Mrs. Parker then called the hospital and requested an ambulance. When an officer arrived at the scene, Mrs. Parker asked him to remove the cord from her neck, but he told her to sit down and wait for the ambulance.

Mrs. Parker's injuries were photographed at the scene of the offense and at the hospital. These photographs were entered into evidence at trial. Mrs. Parker also described her injuries at trial, stating that

> my neck was quite blue [and] bleeding; my head had two big gashes in it, [which the doctors] had to sew up; my arms were black and blue; my face was black and blue; I've got a bad place on my leg that hasn't healed yet; my back - well I had bruises all over me. And of course I was bloody.

Mrs. Parker's injuries required her to be hospitalized for seven days. At the time of trial, she was "doing fair," but she still had "some marks" on her leg and was having trouble hearing as a result of the appellant "stomping" on her head.

After she was taken to the hospital, several officers, including Officer Chad Smith and Agent Joe Craig, came to question Mrs. Parker about her attack. She provided the officers with a description of her assailant, describing him as clean-shaven with short hair. Additionally, she related that her assailant was wearing dark trousers, an orange and green windbreaker, and a white t-shirt. When the officers showed her a photo lineup, she was unable to positively identify her assailant, but did note that one of the individuals looked like her assailant but was "darker." At trial she identified the appellant as the man who attacked her.

Mrs. Parker testified that in addition to taking an undetermined amount of money, the appellant had taken a green Erin Bank money bag containing fifty-five dollars, the two hundred

dollar check, a gold bracelet, her husband's wedding rings and Elgin pocket watch, her mother's wedding ring, her father's "elk ring," the victim's purse, the revolver, and various other items. None of these items were recovered. She further surmised that the appellant must have brought the brown extension cord to her house because she did not own one. Mrs. Parker testified that these events lasted more than an hour.

Officer Dalton Greenwell testified at trial that on April 6, 2001, he responded to a call regarding a "911 hangup" at 125 Front Street. When he arrived at that address, he proceeded to the back of the house where he observed that the back door was ajar and the glass had been broken out of the back door. Officer Greenwell called out to Mrs. Parker. He testified that as she approached, he observed a large cut on her head, blood covering her face, and a telephone cord and brown extension cord tied around her neck. Mrs. Parker asked Officer Greenwell to remove the cords because she was having trouble breathing, but he was unable to untie the knots. While at the scene, Officer Greenwell discovered a broom outside the back door. He testified that the broom appeared to have been used to break the glass out of the doors. He observed blood on the broom's handle and throughout the house.

Erin Police Chief Tommy Parchman also responded to the call at 125 Front Street. When he arrived at the scene, he observed that the glass had been broken out of the back door. He also observed Mrs. Parker sitting in a chair near the door. Chief Parchman testified at trial that he assisted in the collection of evidence, photographed Mrs. Parker's injuries before she was taken to the hospital, and photographed Mrs. Parker's residence. Thereafter, he collected a piece of glass and a "wood strip" from the back door. Both items appeared to have blood on them. Chief Parchman explained that he took these items because he "felt like whoever broke in had cut himself" and the blood could be used for DNA analysis.

Chief Parchman subsequently accompanied several officers to the hospital to interview Mrs. Parker. After Mrs. Parker provided them with a description of her assailant, she was asked to identify her assailant from a photo lineup. Based upon Mrs. Parker's description and her identifications from the photo lineup, the officers developed the appellant as a suspect.

Chief Parchman testified that after midnight, he and the other officers went to an apartment rented by Sandra Cooksey, in which apartment the appellant was allegedly residing. Chief Parchman testified that the appellant "came out of the bathroom" and was ordered to the floor to be handcuffed. Chief Parchman observed what appeared to be a fresh cut on the appellant's hand, a cut the appellant claimed to have received while he was being handcuffed. However, Chief Parchman testified that the officers did not find any glass or sharp object on the floor.

Several days later, Chief Parchman discovered a garbage can in a creek near Mrs. Parker's house. Inside the garbage can, he found an apron, a pillowcase, and a bedspread. Chief Parchman related that Mrs. Parker had reported that on the night of the offense, the appellant had used these items to wipe blood from his hands. Chief Parchman further testified that these items had

what appeared to be blood on them. Chief Parchman subsequently gave these items to Agent Craig for testing at the Tennessee Bureau of Investigation ("TBI") crime laboratory.

On cross-examination, Chief Parchman acknowledged that he was familiar with Sandra Cooksey. He related that the appellant and Cooksey were first cousins and that the couple had a nineteen-year-old son. Chief Parchman testified that a few days prior to the instant offense, officers had been called to Cooksey's apartment regarding a domestic disturbance. During this disturbance, the appellant had allegedly broken the glass out of the front door of the apartment. Chief Parchman related that when the officers returned to the apartment on the night of the instant offense, the glass had not been repaired. Nevertheless, Chief Parchman insisted that he did not find any glass on the floor where the appellant had lain while being handcuffed.

Investigator Ted Tarpley of the District Attorney General's Office testified that on April 6, 2001, he was asked to assist the Erin Police Department in an investigation at 125 West Front Street. He stated that after surveying the scene of the crime, he accompanied several other officers to the hospital to interview Mrs. Parker. Investigator Tarpley related that once the appellant was identified as a suspect, the officers went to Cooksey's apartment. When the officers arrived at the apartment, they informed Cooksey that they were there to speak to the appellant, and Cooksey and her son left.

Investigator Tarpley testified that he and the other officers were cautious as they approached the apartment because they were aware that one of the items stolen from Mrs. Parker's house was a gun. Because he was not wearing a bullet-proof vest, Investigator Tarpley remained outside while the other officers entered the apartment. However, once the appellant was arrested and placed in a patrol car, Investigator Tarpley assisted in the search of the apartment. Investigator Tarpley testified that he "found a card up under the commode in the bathroom." The card was addressed to "Uncle Bill and Aunt Mildred" and was signed "Love, Mike." Investigator Tarpley stated that he also observed blood and wet "washrags" in the bathroom sink.

Investigator Tarpley then searched a "closet [that] contained the water heater." In this closet, Investigator Tarpley discovered some money in a pile of clothes. He also found a gray t-shirt and black pants "stuffed" behind two blocks that had been removed from the wall. Thereafter, Investigator Tarpley searched the bedroom belonging to the appellant's son, in which bedroom he found a laundry basket containing a jacket that had what appeared to be blood on it. Investigator Tarpley stated, "[W]hen I saw these clothes and we saw the coat, . . . there [was] no question that was the clothes [described by Mrs. Parker]."

At trial, Boyd Phillips, a forensic scientist with the TBI crime laboratory testified that he processed for latent fingerprints eight items submitted by Agent Joe Craig. These items included a Christmas card, a green First Star checkbook, a Scottish Rites telephone book, a red pocketknife, a green money bag, a bottle of 409 cleaner, and another green checkbook that contained the suicide note. Unfortunately, Phillips was unable to lift an indentifiable print from any of these items.

Agent Margaret Bash, a forensic serologist with the TBI crime laboratory, testified that she also received several items from Agent Craig, which items included a broom, a piece of broken glass, a wood shaving, a rug, and fingernail scrapings taken from Mrs. Parker. Agent Bash stated that she was asked to test the items for the presence of blood and to conduct DNA analysis. Testing revealed the presence of blood on the broom, the piece of glass, the wood shaving, and the rug. Moreover, the DNA obtained from the blood on the broom, the piece of glass, and the wood shaving matched the appellant's DNA. Agent Bash testified that "the probability of an unrelated individual having the same DNA profile . . . [was] greater than one in six billion." Agent Bash also discovered the presence of the appellant's DNA in Mrs. Parker's fingernail scrapings. However, she was unable to get a DNA profile from the blood on the rug.

Chief Deputy Darrell Allison with the Houston County Sheriff's Department assisted in the investigation at Mrs. Parker's house. He testified at trial that he was asked to prepare a photo lineup to be shown to Mrs. Parker. After preparing the photo lineup and delivering it to Agent Craig, Chief Deputy Allison accompanied the other officers to the Cooksey apartment. Chief Deputy Allison testified that when they arrived at the apartment, the appellant was in the bathroom. Chief Deputy Allison did not enter the apartment until the appellant had exited the bathroom and lain down on the floor to be handcuffed. Chief Deputy Allison related that as he handcuffed the appellant, the appellant exclaimed, "Oh you have cut my hand." However, Chief Deputy Allison stated that he did not find any object upon which the appellant could have cut his hand. Moreover, Chief Deputy Allison noted that the blood on the appellant's hand appeared to be dry.

TBI Agent Joe Craig testified that he was called to assist in the investigation at Mrs. Parker's residence. He stated that he first went to the hospital to interview Mrs. Parker, then he went to the Cooksey apartment to arrest the appellant. At the hospital, Mrs. Parker informed Agent Craig that her assailant was about six feet tall. She described the clothing worn by her assailant and stated that he was clean-shaven with short hair. Agent Craig further related that although Mrs. Parker was able to "narrow[] her photo [identification] down to two people, she was unable to positively identify [the appellant]."

Agent Craig testified that he was present at the Cooksey apartment when Chief Deputy Allison placed the handcuffs on the appellant. He related that he did not observe a cut on the appellant's hand until the appellant stood up. However, Agent Craig stated that, because there was no glass or other sharp object on the floor, he did not believe that the appellant's hand was cut while being handcuffed.

Agent Craig testified that he assisted in the collection of evidence. He recalled that at the Cooksey apartment, the officers discovered seventy dollars ($70) in a "utility closet," forty dollars ($40) in a bedroom, and a Christmas card in the bathroom between the toilet and the vanity. Agent Craig testified that he did not request that the crime scene unit process the scene for fingerprints, but instead collected evidence that Mrs. Parker alleged the appellant had touched. Moreover, because Mrs. Parker informed the officers that the appellant had gained access into her

-6-

house by breaking the glass in the back door and storm door, Agent Craig chose to submit the broom, the broken piece of glass, and the wood shaving for blood and DNA analysis.

At trial, Dr. Daniel Martin testified that he treated Mrs. Parker when she was brought into the emergency room on the night of the offense. Dr. Martin stated that Mrs. Parker was in serious condition when she arrived at the hospital. Dr. Martin testified that

> [Mrs. Parker] had multiple head trauma, a deep scalp laceration, she had strangulation injury to her neck, she had multiple bruises and trauma of her hips, her legs and her back. She had severe anemia. Her blood count was low because of the trauma, she ble[d]. Then she had her underlying medical problems chronic obstructive lung disease, high blood pressure and arthritis. . . . [T]hat combination of injuries [was] very severe and . . . potentially life threatening.

Dr. Martin related that the deep lacerations to Mrs. Parker's scalp required a surgeon to "repair." Dr. Martin further testified that Mrs. Parker suffered severe swelling and bruising of the neck, which worsened over the following twenty-four to thirty-six hours, resulting in difficulty breathing. He stated that she was barely able to swallow and had to talk in a whisper. Dr. Martin opined that, although she made a remarkable recovery, his "initial anticipation for [Mrs. Parker] was not real good."

On cross-examination, Dr. Martin conceded that Mrs. Parker was alert when she was brought into the emergency room. Moreover, he did not see anything to indicate that she had suffered any brain damage and she had not broken any bones. Dr. Martin related that Mrs. Parker's injuries did not require blood transfusions, placement on a respirator, or admittance to the intensive care unit. However, he did prescribe Demerol for her pain.

Faye Kiser Sanders, the appellant's cousin, testified at trial on behalf of the appellant. Sanders testified that she had taken care of Mrs. Parker's husband for many years. She further related that on the night of the alleged offense, the appellant came to her house. Sanders stated that she was watching a movie when the appellant knocked at the door. The appellant then entered the house and asked if "Terry" was home. When Sanders informed the appellant that "Terry" was not home, the appellant left. Sanders testified that she did not observe the appellant's attire that evening. She stated that she was certain that the appellant came to her house around 7:00 p.m. because the movie she was watching when he came to her house started at 7:00 p.m., the same time as "Diagnosis Murder."

Sandra Elizabeth Cooksey also testified on behalf of the appellant. She testified that she and the appellant were first cousins and that they had a nineteen-year-old son. Cooksey further related that the appellant was residing with her when he was arrested.

Cooksey testified that around dusk on the night of the alleged offense, she and the appellant left her apartment. Cooksey informed the appellant that she was going to her mother's

house and the appellant stated that he was going to his friend Rabbit's house. Cooksey visited her mother for approximately fifteen minutes before walking to Rabbit's house. Cooksey related that when the couple left Rabbit's house, they "caught a ride" with an unknown white male in a pickup truck. Cooksey testified that she asked the driver to take her back to her apartment, but the appellant decided to go riding around with this individual. Cooksey then went to her cousin's house until the appellant returned home around 10:00 p.m.

Cooksey testified that she and the appellant had not been in bed long before the police arrived at the apartment. She stated that when the officers asked her if the appellant was in the apartment, she initially told them that he was not. Cooksey explained that because of the prior domestic disturbance, the appellant was not supposed to be in her apartment. However, she testified that after the officers forced her son to the ground and placed a gun to his head, she admitted that the appellant was inside the apartment. Cooksey related that the appellant had cut his hand the night he broke the glass out of the door to her apartment. She further stated that on the night the appellant was arrested for the instant offense, she did not observe him with any jewelry, cash, or a .38 revolver.

Based upon the foregoing evidence, the jury convicted the appellant of especially aggravated burglary, especially aggravated robbery, and attempted first degree murder. Following a sentencing hearing, the trial court sentenced the appellant as a Range II multiple offender to twenty years incarceration for the especially aggravated burglary, forty years incarceration for the especially aggravated robbery, and forty years incarceration for the attempted first degree murder. The trial court ordered that the sentences for especially aggravated burglary and especially aggravated robbery be served concurrent to each other, but consecutively to the sentence for attempted first degree murder, for a total effective sentence of eighty years incarceration. On appeal, the appellant contends that (1) the evidence was insufficient to show serious bodily injury, an essential element of especially aggravated burglary and especially aggravated robbery; (2) the trial court erred in admitting into evidence a color photograph depicting the victim's injuries; (3) the trial court erred in charging the jury; (4) count three of the indictment charging attempted first degree murder was insufficient for failing to allege an overt act or name a victim; and (5) the trial court erred in its application of certain enhancement factors and the imposition of consecutive sentencing..

## II. Analysis
A. Especially Aggravated Burglary Conviction

Although not raised by either party, the appellant's conviction for especially aggravated burglary violates Tennessee Code Annotated section 39-14-404(d), which provides that "[a]cts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." Consequently, "[t]his subsection prohibits using the same act to prosecute an accused for both especially aggravated burglary and another offense." State v. Oller, 851 S.W.2d 841, 843 (Tenn. Crim. App. 1992). In the instant case, the appellant was convicted of both especially aggravated burglary and especially aggravated robbery based, in part, upon the serious bodily injury suffered by Mrs. Parker. Because section 39-14-404(d) prohibits the conviction for especially aggravated burglary, we recognize this as plain error and modify the appellant's conviction for especially aggravated burglary to aggravated burglary. Tenn. R. Crim. P.

52; see also State v. Gerald Leander Henry, No. 01C01-9505-CR-00161, 1999 Tenn. Crim. App. LEXIS 167, at **85-86 (Nashville, Feb. 25, 1999). The reduction in the appellant's sentence for this conviction will be discussed in the sentencing section of this opinion.

B. Sufficiency of the Evidence

The appellant contends that, because the State failed to prove that the victim suffered serious bodily injury, the evidence was insufficient to sustain his convictions for especially aggravated burglary and especially aggravated robbery. As previously noted, we have reduced the appellant's conviction for especially aggravated burglary to aggravated burglary. Accordingly, we must determine whether the evidence was sufficient to convict the appellant of aggravated burglary and especially aggravated robbery.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. Id. This court will not reweigh or reevaluate the evidence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated burglary is the burglary of a habitation. Tenn. Code Ann. § 39-14-403(a) (1997). Serious bodily injury is not an element of this offense. However, serious bodily injury is an element of especially aggravated robbery, which requires that the robbery be accomplished with a deadly weapon and that the victim suffer serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (1997). Thus, the State was required to prove serious bodily in order to sustain the appellant's conviction for this offense.

"Serious bodily injury" is defined as bodily injury involving:
(A) A substantial risk of death;
(B) Protracted unconsciousness;
(C) Extreme physical pain;
(D) Protracted or obvious disfigurement; or
(E) Protracted loss or substantial impairment of a function of a bodily
member, organ or mental faculty.
Tenn. Code Ann. § 39-11-106(a)(34) (1997). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2).

The appellant argues that the injuries suffered by Mrs. Parker are analogous to those suffered by the victim in State v. Sims, 909 S.W.2d 46 (Tenn. Crim. App. 1995). In Sims, 909 S.W.2d at 48-49, the victim received a broken nose, a bruised cheekbone, black eyes, and a laceration across the bridge of her nose. Applying the ejusdem generis canon of statutory construction, this court held that "the pain commonly associated with a broken nose [was not] extreme enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty."[3] Id. at 49. Accordingly, this court concluded that the victim's injuries did not constitute serious bodily injury and modified Sims's conviction for especially aggravated robbery to aggravated robbery. Id. at 50.

The appellant contends that, like the victim in Sims, Mrs. Parker "did not suffer serious pain," nor did her injuries involve a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement, or loss or impairment of the use of a bodily member, organ or mental faculty. The State responds that the appellant's reliance on Sims is misplaced. We agree with the State, finding the facts in the instant case to be distinguishable from Sims.

As a result of her injuries, Mrs. Parker was hospitalized for seven days. Dr. Martin opined that Mrs. Parker was "in a serious medical condition when she arrived at the hospital" and that the combination of her injuries was potentially life-threatening. Dr. Martin testified that Mrs. Parker suffered from multiple head trauma and that her deep scalp lacerations required a surgeon to "repair." He related that the bruising and swelling of Mrs. Parker's neck worsened after she was admitted to the hospital, resulting in difficulty breathing and swallowing. Moreover, Mrs. Parker lost a significant amount of blood and was suffering from severe anemia. Dr. Martin testified that although the victim made a remarkable recovery, "[his] initial anticipation for [Mrs. Parker] was not real good."

Mrs. Parker testified at trial that she had "a bad place on [her] leg that [had not] healed." She also stated that as a result of the appellant "stomping" on her head, she continued to have trouble hearing. Taken in the light most favorable to the State, the evidence was sufficient for a rational trier of fact to conclude that Mrs. Parker suffered serious bodily injury. The combination of her injuries demonstrated a substantial risk of death, while her difficulty hearing demonstrated the impairment of a bodily organ. Moreover, unlike the victim in Sims, Mrs. Parker was prescribed Demerol to ease the pain from which she suffered as a result of her attack. Accordingly, the evidence was sufficient to sustain the appellant's conviction for especially aggravated robbery. See State v. Thomas J. Tackett, No. M1999-02541-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 479 (Nashville, June 28, 2001).

B. Color Photograph of Victim

---

[3] "[E]jusdem generis means when words follow an enumeration of classes of things the words should be construed to apply to things of the same general class as those enumerated. Therefore, the enumerated portions of the definition of serious bodily injury should be read as coming from the same class of injuries." Sims, 909 S.W.2d at 49.

The appellant next contends that the trial court erred in allowing into evidence a color photograph of Mrs. Parker taken shortly after the attack. Specifically, the appellant alleges that "the photograph . . . was prejudicial in that it showed a great deal of blood on the face of the elderly victim as well as in the hair of the elderly victim." The appellant maintains that the testimony of Dr. Martin was sufficient to describe Mrs. Parker's injuries. Moreover, the appellant argues that the trial court should have instead admitted into evidence a black and white photograph depicting Mrs. Parker's injuries, which photograph the State had in its possession at trial. The State responds that the trial court did not err in admitting the color photograph because the photograph was relevant to prove serious bodily injury and the intent to commit first degree murder and to corroborate Mrs. Parker's testimony.

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that ruling will not be overturned on appeal absent a showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). "'If relevant, the photograph is not rendered inadmissible because the subject portrayed could be described by words; . . . the photograph would be cumulative; . . . or [the photograph] is gruesome or for some other reason is likely to inflame the jury.'" Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973) (quoting 3 Wharton's Criminal Evidence § 637 (13th Edition)). However, relevant photographs may be excluded if their probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951.

The photograph in question shows Mrs. Parker sitting in her kitchen with a significant amount of blood on her face and in her hair. Because the appellant was charged with especially aggravated robbery, the photograph was relevant to show that Mrs. Parker suffered serious bodily injury, an essential element of the offense. Tenn. Code Ann. § 39-13-403(a)(2). Moreover, the photograph corroborated Mrs. Parker's testimony regarding the events of the evening and the injuries she sustained. See State v. James Spurling, No. E2001-00601-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 962, at *10 (Knoxville, Nov. 7, 2002) (finding photographs of the victim in the hospital admissible to corroborate testimony regarding the victim's wounds). Furthermore, although the photograph shows a significant amount of blood, we do not find the photograph to be especially gruesome or horrifying. Accordingly, we conclude that the trial court did not abuse its discretion in admitting this photograph into evidence.

C. Jury Instructions
1. Failure to Properly Charge Especially Aggravated Burglary

The appellant contends that the trial court "erred in not charging the statutory language of especially aggravated burglary [under which the appellant] was indicted." The appellant asserts that "[s]ince [he] was indicted under the theory he entered the victim's residence with the intent to commit especially aggravated robbery and first degree murder, he was entitled to have the jury charged in regard to that law." The State maintains that both count one of the indictment and the trial court's instruction to the jury were sufficient to support the appellant's conviction for

especially aggravated burglary. Again, we note that the appellant's conviction for especially aggravated burglary has been modified to aggravated burglary. Accordingly, we will address this issue in light of that modification.

> A person commits burglary who, without the effective consent of the property owner:
> (1) Enters a building other than a habitation . . . not open to the public, with intent to commit a felony, theft or assault;
> (2) Remains concealed, with the intent to commit a felony, theft or assault, in a building;
> (3) Enters a building and commits or attempts to commit a felony, theft or assault; or
> (4) Enters any freight or passenger car, automobile, truck, trailer, boat, airplane or other motor vehicle with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault.

Tenn. Code Ann. § 39-14-402(a) (1997). Aggravated burglary is defined as the burglary of a habitation. Tenn. Code Ann. § 39-14-403(a). Especially aggravated burglary is the burglary of a habitation or other building where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-14-404(a).

In the instant case, count one of the indictment charged the appellant with especially aggravated burglary under subsection (a)(1) of the burglary statute, charging in pertinent part that

> JAMES RUBEN CONYERS . . . did unlawfully, feloniously, intentionally, and knowingly enter the habitation of Mildred Parker, which was not open to the public, with intent to commit Especially Aggravated Robbery and First Degree Murder and did cause serious bodily injury to the said Mildred Parker, in violation of [Tennessee Code Annotated section] 39-14-404, a Class B felony, all of which is against the peace and dignity of the State of Tennessee.

See Tenn. Code Ann. § 39-14-402(a)(1). However, the trial court instructed the jury on the offense of especially aggravated burglary and the lesser-included offense of aggravated burglary using the statutory language in subsection (a)(3) of the burglary statute, stating,

> Any person who commits the offense of especially aggravated burglary is guilty of a crime. For you to find the defendant guilty of this offense, the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements:
> (1) that the defendant entered a habitation; and
> (2) that the defendant committed or attempted to commit especially aggravated robbery or first degree murder, both felonies.

See Tenn. Code Ann. § 39-14-402(a)(3).[4] Essentially, the appellant challenges the variance between the indictment and the proof at trial.

The United States and the Tennessee Constitutions require that an indictment inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. An indictment satisfies this constitutional requirement "if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). A variance in the indictment and the proof at trial is not fatal unless it is deemed to be material and prejudicial, affecting the substantial rights of the defendant. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). In other words,

> [u]nless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

Id.

With these principles in mind, we conclude that the variance between count one of the indictment and the instruction given by the trial court did not affect the substantial rights of the appellant. Count one of the indictment, which cited the pertinent statute, sufficiently informed the appellant that he was being charged with especially aggravated burglary. The appellant makes no argument that he was misled by the indictment, surprised at trial, or unable to prepare a defense. In fact, during the trial court's charge to the jury, the appellant did not object to the challenged instruction. Moreover, the indictment named the victim and alleged the date upon which the offense occurred, eliminating the danger that the appellant would be prosecuted again for the same offense. Because the appellant was not prejudiced by the variance in the indictment and the proof at trial, any error was harmless.

2. Failure to Properly Charge Aggravated Burglary

The appellant also challenges the trial court's instruction on the lesser-included offense of aggravated burglary. The trial court instructed the jury on this offense as follows:

---

[4] The trial court instructed the jury regarding the lesser-included offense of aggravated burglary as follows:
Any person who commits the offense of aggravated burglary is guilty of a crime.
For you to find the defendant guilty of this offense, the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements:
(1) that the defendant entered a habitation; and
(2) that the defendant committed or attempted to commit aggravated robbery and first degree murder.

Any person who commits the offense of aggravated burglary is guilty of a crime. For you to find the defendant guilty of this offense, the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements:
(1) that the defendant entered a habitation; and
(2) that the defendant committed or attempted to commit aggravated robbery and first degree murder.

The appellant contends that, because he was charged with especially aggravated robbery, it was reversible error for the trial court to instruct the jury that the appellant could be convicted of aggravated burglary based upon his entering a habitation and committing the lesser-included offense of aggravated robbery. However, the appellant fails to cite any law in support of this argument, thereby waiving the argument on appeal. Tenn. R. App. P. 27(a)(7). Nevertheless, because we have modified the conviction for especially aggravated burglary to aggravated burglary, the appellant's argument regarding the instruction on aggravated burglary is moot.

3. Failure to Charge Aggravated Assault as Lesser-Included of Especially Aggravated Robbery
The appellant further challenges the trial court's failure to charge aggravated assault as a lesser-included offense of especially aggravated robbery. The State concedes that aggravated assault is a lesser-included offense of especially aggravated robbery, but asserts that the error was harmless beyond a reasonable doubt.

Tennessee Code Annotated section 40-18-110(a) (1997) provides that a trial court must charge the jury as to the law of each offense "included" in an indictment, namely the charged offense and any lesser-included offenses.[5] "In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002).

Under the test adopted in State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999), an offense is a lesser-included offense if:
(a) all of its statutory elements are included within the statutory elements of the offense charged; or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
(1) a different mental state indicating a lesser kind of culpability; and/or
(2) a less serious harm or risk of harm to the same person, property or public interest; or
(c) it consists of

---

[5] This statute was amended in 2001, with the amendment to "govern all trials conducted on or after January 1, 2002." Tenn. Code Ann. § 40-18-110, Compiler's Notes (Supp. 2002).

> (1) facilitation of the offense charged or of an offense
> that otherwise meets the definition of lesser-included
> offense in part (a) or (b); or
> (2) an attempt to commit the offense charged or an
> offense that otherwise meets the definition of lesser-
> included offense in part (a) or (b); or
> (3) solicitation to commit the offense charged or an
> offense that otherwise meets the definition of lesser-
> included offense in part (a) or (b).

Because the elements of aggravated assault are included in the definition of especially aggravated robbery, this court has previously held that aggravated assault is a lesser-included offense of especially aggravated robbery under part (a) of the Burns test. State v. Jason C. Carter, No. M1998-00798-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 340, at *24 (Nashville, Apr. 27, 2000).

Next, we consider whether the evidence warranted an instruction on the lesser-included offense of aggravated assault. As a general rule,

> evidence sufficient to warrant an instruction on the greater offense
> also will support an instruction on a lesser offense under part (a) of
> the Burns test. In proving the greater offense the State necessarily has
> proven the lesser offense because all of the statutory elements of the
> lesser offense are included in the greater.

State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002) (quoting Allen, 69 S.W.3d at 188). We conclude that, because the evidence was sufficient to warrant an instruction on the greater offense of especially aggravated robbery, the evidence was necessarily sufficient to warrant an instruction on the lesser-included offense of aggravated assault. Id.; see also State v. Joel Christian Parker, No. M2001-00773-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 1093, at *11-12 (Nashville, Dec. 18, 2002). Accordingly, the trial court erred in failing to instruct the jury on the lesser-included offense of aggravated assault.

Having concluded that the trial court's failure to instruct the jury on aggravated assault was error, we must now determine whether the error was harmless beyond a reasonable doubt. In determining whether it was harmless beyond a reasonable doubt not to charge a lesser-included offense, our supreme court has held that

> the reviewing court must determine whether a reasonable jury would
> have convicted the defendant of the lesser-included offense instead
> of the charged offense. In other words, the reviewing court must
> determine whether it appears beyond a reasonable doubt that the trial
> court's failure to instruct on the lesser-included offense did not affect
> the outcome of the trial.

Richmond, 90 S.W.3d at 662 (citing Allen, 69 S.W.3d at 191).

The difference between aggravated assault and the lesser-included offenses which were charged to the jury, especially aggravated robbery, aggravated robbery, robbery, and theft, is

the theft element of the charged offenses. It is undisputed that in the instant case there was a theft of property from Mrs. Parker. Moreover, the jury was instructed on the lesser-included offenses of aggravated robbery, robbery, and theft, but opted to convict the appellant of the indicted offense of especially aggravated robbery. Accordingly, we conclude that the trial court's failure to charge aggravated assault as a lesser-included offense was harmless beyond a reasonable doubt.

4. Modifications to Jury Charge

The appellant argues that the trial court "erred in making modifications to the jury instructions during the time period the [c]ourt was giving instructions to the jury verbally." The appellant asserts that the trial court "took numerous breaks" in order to make corrections to the instructions. However, our review of the record reflects that while charging the jury the trial court took only one "break." Moreover, during this break, the trial court did not modify the instructions, but instead supplemented the charge with an instruction the trial court had inadvertently omitted.[6] We find no error in the efforts of the trial court to ensure that the jury received a complete charge of the law.

The appellant also contends that, because he was not provided with a copy of the modifications to the jury instructions and because a copy of the instructions was not made a part of record on appeal, it is likely that the jury did not receive a copy of the modifications.[7] We agree that it is mandatory that every word of the trial court's instructions to the jury be reduced to writing and given to the jury for deliberations. Tenn. R. Crim. P. 30(c). However, we are unable to conclude from the record that the jury was not provided with a complete copy of the instructions. Before the jury retired to deliberate, the trial court directed the jury, "Take the charge that I've just read to you and go to the jury room." There is no reason to believe that the jury did not do as instructed or that the written instructions failed to include the omitted instruction. We find this issue to be without merit.

D. Attempted First Degree Murder

1. Indictment

The appellant asserts that the trial court should have granted a judgment of acquittal or a new trial on count three of the indictment charging attempted first degree murder because the indictment failed to allege an overt act and failed to name a victim. The State responds that the indictment provided the appellant with sufficient notice that he was being charged with the attempted first degree murder of Mrs. Parker.

As previously noted, the United States and the Tennessee Constitutions require that an indictment inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. An indictment satisfies the constitutional requirement of notice "if it

---

[6] Upon leaving the bench, the trial court stated, "Members of the Jury, give me just a minute. There is a part I've left out and everything I tell you I have to read it to you."

[7] Although the technical record does not contain a copy of the written instructions, the trial transcript includes the trial court's charge to the jury.

provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Moreover, Tennessee Code Annotated section 40-13-202 (1997) provides that an indictment "must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment . . . ."[8]

> The indictment alleged the following three counts, all on a single page:
> The Grand Jurors for the State of Tennessee, duly elected, impaneled, sworn, and charged to inquire, in and for the body of the County of Houston, in the State aforesaid, upon their oaths, present: That JAMES RUBEN CONYERS heretofore, to-wit: on or about the 6th day of April, 2001, and prior to the finding of this Indictment, in the County of Houston aforesaid, then and there, did unlawfully, feloniously, intentionally, and knowingly enter the habitation of Mildred Parker, which was not open to the public, with intent to commit Especially Aggravated Robbery and First Degree Murder and did cause serious bodily injury to the said Mildred Parker, in violation of [Tennessee Code Annotated section] 39-14-404, a Class B Felony, all of which is against the peace and dignity of the State of Tennessee.
>
> COUNT TWO:
> And the Grand Jurors, aforesaid, upon their oaths, aforesaid, do further present and say, that on or about the 6th day of April, 2001, and prior to the finding of this Indictment, in the County and State aforesaid, the said JAMES RUBEN CONYERS then and there, did unlawfully, feloniously, intentionally, knowingly and violently, by use of a deadly weapon, to-wit: a pistol and electrical cord, a further description to the Grand Jurors aforesaid unknown, take from the person of Mildred Parker, good and lawful currency of the United States of America in the amount of Five Hundred Dollars ($500.00), one (1) check in the amount of Five Hundred Dollars ($500.00) and one (1) check in the amount of Two Hundred Dollars ($200.00) of the value of between Five Hundred Dollars ($500.00) and One Thousand Dollars ($1,000.00) and as a result Mildred Parker suffered serious bodily injury, in violation of [Tennessee Code Annotated section] 39-13-403, a Class A Felony, all of which is against the peace and dignity of the State of Tennessee.

---

[8] "Prolixity" is defined as "[t]he unnecessary and superfluous statement of facts in pleading or in evidence." Black's Law Dictionary 1213 (6th ed. 1990).

COUNT THREE:
And the Grand Jurors, aforesaid, upon their oaths, aforesaid, do further present and say, that on or about the 6th day of April, 2001, and prior to the finding of this Indictment, in the County and State aforesaid, the said JAMES RUBEN CONYERS then and there, did unlawfully, feloniously, intentionally, deliberately and with premeditation attempt to commit the criminal offense of First Degree Murder, as classified in [Tennessee Code Annotated section] 39-13-202, in violation of [Tennessee Code Annotated section] 39-12-101, a Class A Felony, all of which is against the peace and dignity of the State of Tennessee.

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (1997). An indictment charging attempt to commit a crime should specifically allege the intent to commit the specific crime and an overt act. State v. Frederick Rydel Walker, No. M1998-00068-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 379, **10-11 (Nashville, May 12, 2000). First degree murder, other than a murder committed during the perpetration or attempted perpetration of one of the felonies or acts enumerated in Tennessee Code Annotated section 39-13-202(a)(2) and (3), is a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2002).

As previously noted, the appellant argues that his conviction for attempted first degree murder is void because count three of the indictment failed to allege an overt act and name a victim. The issue before this court is whether the facts alleged in counts one and two remedied the failure of count three to name the victim or allege the specific facts surrounding the charge of attempted first degree murder.

In State v. Cureton, 38 S.W.3d 64, 82 (Tenn. Crim. App. 2000), this court observed that "there is a split of authority as to whether each count of a multi-count indictment must stand alone or whether they can be read together."

There is authority that there can be no aid between counts, to supply an omission in one of them, if the counts are not connected in some way, such as by internal reference, and that any such reference or incorporation must be express, not implicit. However, there is also authority that all counts of a multiple-count indictment should be read as a whole, and elements missing from one count can be supplied by another.

Id. (citing 41 Am. Jur. 2d Indictments & Informations § 96 (1995)). Tennessee courts addressing this issue have concluded that, under certain circumstances, the counts of a multi-count indictment may be read together. See State v. Youngblood, 287 S.W.2d 89, 91 (Tenn. 1956) ("different counts may, within themselves, not support an indictment but if they are properly connected with preceding counts then the two may be taken together and support an indictment"); Hayes v. State, 513 S.W.2d 144, 146 (Tenn. Crim. App. 1974) (where the first count of an indictment charging drug possession named the controlled substance and the second count of the indictment stated only "the aforesaid controlled substance," the indictment was not defective ). After reviewing these cases, this court in Cureton, 38 S.W.3d at 83, concluded that because all the counts in the indictment in that case alleged the same victim, the same date, and were related to each other, the counts could be read together for the purpose of providing notice to the defendant.

In the instant case, the appellant was charged in a three-count indictment, all counts on a single page. All three counts alleged that the offenses occurred on the same date, April 6, 2001. Count one alleged that the appellant entered the habitation of Mildred Parker with the intent to commit first degree murder. Count two alleged that the appellant "did . . . by use of a deadly weapon, to-wit: a pistol and electrical cord, . . . take from the person of Mildred Parker, [a sum of money] and as a result Mildred Parker suffered serious bodily injury." Finally, count three of the indictment alleged in conclusory language that the appellant "did unlawfully, feloniously, intentionally, deliberately and with premeditation attempt to commit the criminal offense of First Degree Murder . . . ." Count four also cited the proscriptive statute for first degree murder, which provides in relevant part that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).

Taken as a whole, we conclude that the indictment provided adequate notice to the appellant and the trial court of the offense charged. Hill, 954 S.W.2d at 727. We further conclude that, by naming a victim in counts one and two and alleging that the offense occurred on a date certain, the indictment protected the appellant against double jeopardy. Id. Accordingly, we find this issue to be without merit.

2. Election of Offenses

The appellant also contends that the trial court erred by not requiring the State "to elect the particular [act] upon which it was relying for the offense of attempted first-degree murder." The appellant states that Mrs. Parker alleged that the appellant broke into her residence, took her gun, attempted to strangle her with a cord, hit her in the head with an unidentified object, and then "stomped" on her head. The appellant argues that any of these acts alleged by Mrs. Parker could

have been construed as an attempt to kill. The appellant asserts that, because the State was not required to elect offenses, he was "deprived of his right to a unanimous jury verdict . . . , was not [able] to prepare to defend a specific charge, [and was] denied his constitutional protection against double jeopardy."

Our supreme court "has consistently held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). The election requirement ensures that the defendant is able to prepare a defense for a specific charge, protects the defendant against double jeopardy, and enables the trial court and the appellate courts to review the legal sufficiency of the evidence. State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000). More importantly, the election requirement "ensures that the jurors deliberate over and render a verdict on the same offense." Id. However, when the evidence does not establish that multiple offenses have been committed, it is not necessary for the State to make an election. Id. Accordingly, we must determine whether the acts committed by the appellant were multiple discrete acts that constituted individual substantive offenses or were a continuing course of conduct that constituted a single offense. Id.

"Continuing offenses generally stem from a single motivation or scheme, although such offenses can be committed by multiple discrete acts occurring over a period of time." Id. In State v. Pelayo, 881 S.W.2d 7, 9 (Tenn. Crim. App. 1994), the defendant stabbed the victim, the victim fled, and then the defendant stabbed the victim again. This court concluded that, although the assaults constituted separate acts, the acts "coalesced into an 'unmistakable single act.'" Id. at 13. This court reached a similar conclusion in State v. Eddie Howard Pittman, No. W2000-01582-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 729 (Jackson, Sept. 7, 2001). In that case, the defendant pointed a gun at the victim's head and pulled the trigger; however, the gun misfired. Id. at *2. The victim and the defendant then wrestled with the gun before the defendant was able to shoot at the victim a second time, this time missing the victim. Id. This court held that these acts "were part of a continuing assault, and constituted but one offense of attempted murder." Id. at **6-7.

Likewise, we conclude that, although the acts committed by the appellant were multiple discrete acts occurring over a period of time, they were part of a continuous attempt to murder Mrs. Parker. The appellant first attempted to strangle Mrs. Parker with the telephone and extension cords. When this was unsuccessful, he forced her off the sofa and banged her head into the floor. Thereafter, he poured Clorox in her face, hit her with an unknown object, and "stomped" on her head. The appellant's brutal attack ended only after he believed she was dead. Because these acts constituted the single offense of attempted first degree murder, the State was not required to make an election. Adams, 24 S.W.3d at 294. This issue is without merit.

E. Sentencing

Finally, the appellant challenges the trial court's application of enhancement factors (5), (10), and (16) to enhance his sentences and the imposition of consecutive sentencing.[9] When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). However, this presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the record demonstrates that the trial court failed to consider the sentencing principles and the relevant facts and circumstances, review of the sentence will be purely de novo. Id.

In conducting our review, this court must consider (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to the sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the appellant on his own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102 and -103 (1997), -210 (Supp. 2002); see also Ashby, 823 S.W.2d at 168. The burden is on the appellant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

The appellant was sentenced as a Range II multiple offender, for which the applicable range for Class A felonies is twenty-five to forty years and for Class C felonies is six to ten years. Tenn. Code Ann. § 40-35-112(b)(1) and (3) (1997). The presumptive sentence for a Class A felony is the midpoint within the applicable range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). The presumptive sentence for a Class C felony is the minimum within the applicable range if there are no enhancement or mitigating factors. Id. If the trial court finds that such factors do exist, the court must start at the presumptive sentence, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). There is no mathematical formula for valuating factors to calculate the appropriate sentence. State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the trial court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76.

In the instant case, the trial court found no applicable mitigating factors and applied the following enhancement factors:[10]

---

[9] The appellant also challenges the trial court's application of enhancement factor (12); however, after reviewing the transcript of the sentencing hearing, we note that the trial court did not apply this factor.

[10] We note that, beginning July 4, 2002, "the 2002 amendment [to Tennessee Code Annotated section 40-35-114] added present [enhancement factor] (1) and redesignated former (1) through (22) as present (2) through (23), respectively." Tenn. Code Ann. § 40-35-114, Amendments (Supp. 2002). However, for the purposes of this opinion, we will use the former designations applicable at the time of the appellant's sentencing.

(1) the appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(4) the victim of the offense was particularly vulnerable because of age or physical or mental disability;

(5) the appellant treated the victim with exceptional cruelty during the commission of the offense;

(6) the personal injury inflicted upon the victim was particularly great;

(8) the appellant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community;

(9) the appellant possessed or employed a firearm or other deadly weapon during the commission of the offense;

(10) the appellant had no hesitation about committing a crime when the risk to human life was high; and

(16) the offense was committed under circumstances under which the potential for bodily injury to a victim was great.

Tenn. Code Ann. § 40-35-114 (1997).

The appellant first asserts that the trial court failed to specify to which convictions it was applying the enhancement factors. Our review of the record reveals that the trial court stated that enhancement factor (5) applied to the appellant's convictions for especially aggravated burglary and especially aggravated robbery, but failed to specify to which convictions the remaining enhancement factors applied. Accordingly, our review will be de novo with no presumption of correctness.

1. Enhancement Factor (5)

The appellant contends that the trial court erred in applying enhancement factor (5) to his conviction for attempted first degree murder. However, we note that, although the trial court failed to specify to which offenses it was applying the remaining enhancement factors, the trial court announced that it was applying enhancement factor (5) only to the appellant's convictions for especially aggravated robbery and especially aggravated burglary, which conviction this court reduced to aggravated burglary. Nevertheless, because we are conducting a de novo review of the appellant's sentences, we will address the application of enhancement factor (5) to each of the appellant's convictions.

Enhancement factor (5) provides that the appellant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense. Tenn. Code Ann. § 40-35-114(5) (1997). This factor is generally applied to cases involving abuse or torture. State v. Williams, 920 S.W2d 247, 259 (Tenn. Crim. App. 1995). Before a trial court may apply enhancement factor (5) to increase a sentence, the facts of the case must support a "finding of cruelty

under the statute 'over and above' what is required to sustain a conviction for [the] offense." State v. Arnett, 49 S.W.3d 250, 258-59 (Tenn. 2001).

In the instant case, after breaking into the house, the appellant grabbed Mrs. Parker and pulled her by her hair into the house as she attempted to escape. He subsequently forced her to write a suicide note. As Mrs. Parker sat on the sofa, the appellant attempted to strangle her, first with a telephone cord, then with an extension cord. Finding his attempts to be unsuccessful, the appellant dragged Mrs. Parker off the sofa and, while continuing to strangle her, banged her head against the floor. The appellant then hit Mrs. Parker in the head with an unknown object, poured Clorox in her face, and "stomped" on her head, stopping only after Mrs. Parker pretended to be dead. We conclude that these acts clearly demonstrate that the appellant treated Mrs. Parker with exceptional cruelty "over and above" what is required for the instant offenses. See State v. Poole, 945 S.W.2d 93, 99 (Tenn. 1997) (holding that enhancement factor (5) applied to conviction for especially aggravated robbery when the defendant knocked the victim unconscious and left her on the floor under circumstances making it unlikely that she would be discovered); State v. Alvarado, 961 S.W.2d 136, 151 (Tenn. Crim. App. 1996) (holding enhancement factor (5) applied to convictions for aggravated rape and aggravated burglary when the defendant held a knife to the victim's throat and stabbed, bit, and attempted to smother her); State v. Darrin Bryant, No. W2000-01136-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 519, at **19-20 (Jackson, July 11, 2001) (holding that enhancement factor (5) applied to conviction for attempted first degree murder when the defendant stabbed victim up to eight times). Accordingly, we conclude that enhancement factor (5) applies to all three of the appellant's convictions.

2. Enhancement Factor (8)

The appellant argues that, because no proof was offered regarding the appellant's performance on either probation or parole, the trial court erred in applying enhancement factor (8), i.e., the appellant had a previous history of unwillingness to comply with the conditions of a sentence involving release into the community. Tenn. Code Ann. § 40-35-114(8) (1997). However, our review of the presentence report reflects that, in addition to being on probation at the time of the instant offenses, the appellant was convicted on March 3, 1981, of larceny and receiving stolen property, and was ordered to serve one year in confinement followed by three years probation. Less than a year later, on February 13, 1982, the appellant was arrested for second degree burglary, attempt to commit larceny, and two weapon offenses, for which offenses he was subsequently convicted and sentenced. We find this evidence sufficient to support the application of enhancement factor (8).

3. Enhancement Factor (10)

Enhancement factor (10) provides that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10) (1997). The appellant challenges the trial court's application of enhancement factor (10), arguing that the risk to human life is an element of the offense of attempted first degree murder. We agree.

A trial court may not apply an enhancement factor if the factor is an essential element of the offense charged in the indictment. Tenn. Code Ann. § 40-35-114. However, "where a high risk to human life is established with facts separate from those necessary to establish an element of the offense, [enhancement factor (10)] is not an essential element of the offense and may be applied if supported by the facts." State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995). In other words, enhancement factor (10) may be applied if the facts demonstrate that the appellant created a high risk to the life of a person other than the named victim. Id.

The risk to human life is an essential element of the offenses of attempted first degree murder and especially aggravated robbery. State v. Reid, 91 S.W.3d 247, 312 (Tenn. 2002); Bryant, No. W2000-01136-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 519, at *18. Thus, because in the instant case the only person at risk was Mrs. Parker, enhancement factor (10) may not be applied to the appellant's sentences for attempted first degree murder or especially aggravated robbery. However, enhancement factor (10) is not an essential element of aggravated burglary. State v. Maurice Pierre Teague, No. 02C01-9704-CC-00132, 1997 Tenn. Crim. App. LEXIS 814, at *21 (Jackson, Aug. 27, 1997). Moreover, the facts and circumstances surrounding the appellant's commission of aggravated burglary demonstrate that by breaking into Mrs. Parker's house with the intent to commit especially aggravated robbery and attempted first degree murder, the appellant had no hesitation about committing a crime in which the risk to human life was high. Accordingly, we conclude that the evidence supports the application of enhancement factor (10) to the appellant's conviction for aggravated burglary.

4. Enhancement Factor (16)

The appellant also contends that the trial court erred in applying enhancement factor (16), i.e., that the crime was committed under circumstances under which the potential for bodily injury to a victim was great. Tenn. Code. Ann. § 40-35-114(16) (1997). Because "the potential for bodily injury" is inherent in the offenses of attempted first degree murder and especially aggravated robbery, enhancement factor (16) may not be applied to enhance the appellant's sentences for these convictions. Reid, 91 S.W.3d at 312; State v. Marquez Winters, No. W2001-00740-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 872, at **25-26 (Jackson, Oct. 15, 2002). However, "the potential for bodily injury" is not an element of the offense of aggravated burglary. Tenn. Code Ann. § 39-14-403(a). Nevertheless, this court has previously held that "'a trial court should not apply [enhancement factor (16)] absent extraordinary circumstances.'" State v. David Scarbrough, No. E1998-00931-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 512, at *73 (Knoxville, July 11, 2001) (quoting State v. Smith, 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994)). In the instant case, the facts demonstrate such "extraordinary circumstances." Accordingly, we conclude that enhancement factor (16) applies to the appellant's conviction for aggravated burglary.

5. Consecutive Sentences

Finally, the appellant asserts that the trial court erred in ordering the appellant to serve his sentence for attempted first degree murder consecutively to his other sentences. Under Tennessee Code Annotated section 40-35-115 (1997), a trial court may impose consecutive sentences if the

defendant is convicted of more than one offense and the trial court finds by a preponderance of the evidence that:

> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;
> (3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist . . . ;
> (4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life was high;
> (5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . . ;
> (6) [t]he defendant is sentenced for an offense committed while on probation; or
> (7) [t]he defendant is sentenced for criminal attempt.

> Regarding consecutive sentencing, the trial court stated,
> [On count] three, attempt to commit first degree murder, I'm going to give him forty years . . . and I'm going to run [this sentence consecutive to counts one and two], and here is the reason why. [The appellant] had count one and two as far as his crime that he had completed. He committed his robbery and so on and so forth. And then after he cleans [Mrs. Parker's] hair off and takes her out of the bathroom, sets her down on that couch and walks behind her and puts that cord around her neck, then he's going to kill her. That is just like committing one crime today and one tomorrow. It ought to run consecutive. So I'm going to run count three consecutive [to the other counts].

Thereafter, the State noted that the trial court needed to specify under which criteria listed in Tennessee Code Annotated section 40-35-115 the court was imposing consecutive sentencing. The trial court stated that the imposition of consecutive sentences was based upon its finding that the appellant was a professional criminal, had an extensive criminal record, was a dangerous offender, and was sentenced for an offense while on probation. See Tenn. Code Ann. § 40-35-115(b)(1), (2), (4), and (6).

On appeal, the appellant argues that, because the offenses occurred during the same criminal episode, it was error for the trial court "to treat [counts one and two] as though [they were] committed one day and [count three] as though [it were] committed on another day." He further asserts that no proof was offered at the sentencing hearing to show that the appellant was a professional criminal, a dangerous offender, or was sentenced for an offense committed while on probation. Regardless, the trial court also announced that it was imposing consecutive sentences

based upon the appellant's extensive criminal record. The presentence report reflects that since 1979, the appellant has been convicted of numerous felonies, including armed robbery and theft. Thus, the appellant's prior criminal record alone supports consecutive sentencing. This issue is without merit.

Although we have determined that enhancement factors (10) and (16) do not apply to the appellant's convictions for attempted first degree murder and especially aggravated robbery, this does not necessarily lead to a reduction in the appellant's sentences. State v. Winfield, 23 S.W.3d 279, 284 (Tenn. 2000). We conclude that the remaining enhancement factors and the lack of mitigating factors support the imposition of the maximum sentences for each conviction. Moreover, the appellant's extensive criminal record supports the imposition of consecutive sentencing. Based upon these findings, we affirm the forty year sentences imposed for the convictions of especially aggravated robbery and attempted first degree murder. However, because we previously modified the appellant's conviction in count one to aggravated burglary, we must reduce his sentence for this offense to ten years, the maximum for aggravated burglary, a Class C felony. The sentences for aggravated burglary and especially aggravated robbery are to be served concurrently, but consecutive to the sentence for attempted first degree murder, for an effective sentence of eighty years incarceration.

### III. Conclusion

For the foregoing reasons, we affirm the appellant's convictions and sentences for especially aggravated robbery and attempted first degree murder. However, we remand to the trial court for the amendment of the judgment of conviction to reflect this court's modification of the conviction for especially aggravated burglary to aggravated burglary and to reflect the reduction in the sentence on that conviction to ten years.

_____
NORMA McGEE OGLE, JUDGE